United States District Court
Southern District of Texas
**ENTERED**
June 25, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| NACRESHA NICHOLE HAYMOND, § § Plaintiff. § § V. § UNIVERSITY OF TEXAS MEDICAL § BRANCH-CMC, § § Defendant. § | § § § § CIVIL ACTION NO. 4:22-cv-00073 § § § § § § |

## MEMORANDUM AND RECOMMENDATION

Pending before me is a Motion for Summary Judgment filed by Defendant University of Texas Medical Branch at Galveston ("UTMB"). Dkt. 32. Having reviewed the briefing, the record, and the applicable law, I recommend the motion be **GRANTED**.

## BACKGROUND

In July 2017, Plaintiff Nacresha Haymond ("Haymond") began working for UTMB at the Plane State jail. UTMB is a state agency and component institution of The University of Texas System. UTMB contracts with the Texas Department of Criminal Justice ("TDCJ") to provide medical care to TDCJ inmates. Haymond, who is Black, worked for UTMB as an Infectious Control Nurse ("ICN") from July 2017 until September 10, 2020, when she was assigned to non-ICN duties. Nurse Manager Bristy Delao, RN ("Delao") served as Haymond's direct supervisor. Delao reported to Regional Nurse Manager Greg Friesz ("Friesz").

During her time as an ICN, Haymond used one of three desks in the ICN office, a locked office in the jail. Haymond decorated her office and the bulletin board behind her desk every month to correlate with a holiday. In February 2020, in honor of Black History Month, Haymond arranged paper plates in the silhouette of a Black girl. On three occasions in February 2020, someone removed this

silhouette from the wall. Haymond was not present when the silhouette was removed and she does not know who removed it. Haymond reported at least the first two of these instances to Delao and another UTMB manager.

In June or July 2020, while Haymond was out on leave, someone pulled up the vinyl flooring that Haymond and another Black co-worker paid to be affixed in their workspace. Someone also removed a partition Haymond had erected around her desk. Haymond was not present for the removal of the flooring or the partition. She does not know who removed them or if whoever removed them knew that they were her personal property.

Haymond returned to work on the evening of September 9, 2020. Upon her return, Haymond encountered a White male nurse, Anthony Martin ("Martin"). Haymond and Martin had not met prior to that evening. What transpired between Haymond and Martin is disputed. At the end of her second shift, on the morning of Friday, September 11, 2020, Haymond complained to Delao that Martin yelled at her, and was aggressive and disrespectful. At the same time that Haymond complained to Delao about Martin, Haymond also complained to Delao that some staff treated patients differently based on their skin color. That evening, Delao emailed Haymond to "thank [her] for bringing [her] concerns forward," stating that she was "looking into these concerns" and planned on meeting with Haymond "to discuss in more detail." Dkt. 32-1 at 94. In that same email, Delao gave Haymond "a two week notice regarding [her] schedule," requesting that she indicate which shift she preferred not later than September 14, 2020. *Id.*

On Monday, September 14, 2020, Haymond contacted Delao "stating she was calling off for the week." *Id.* at 101. Yet, on Wednesday, September 16, 2020, Haymond "unexpected[ly]" "reported to work," stating that she wanted to meet with Delao. *Id.* Senior Human Resources Consultant Marjorie McAlpin ("McAlpin") served as a witness to the meeting, appearing by phone. During the meeting, Delao first discussed "the concerns [that Haymond] brought forward on September 11, 2020" followed by a discussion of Haymond's "schedule/

time/attendance." *Id.* Delao explained to Haymond that she could not "continuously accommodate her schedule[] for the school year." *Id.* at 103. "Haymond voiced that she felt [they] were refusing her accommodation for her children's schooling," stating that she could work 10 pm to 6 am, but did not want to stay on night shift. *Id.* McAlpin "explained that if [Haymond] was calling in or running late that she had to notify the manager . . ., even if it is FMLA related the manager should be notified of call-ins and tardiness." *Id.* McAlpin "also explained that children going to school and accommodating her schedule long term . . . was not an FMLA or ADA request." *Id.*

Following this meeting, Haymond took an unpaid leave of absence that started on or about September 18, 2020, and continued through October 12, 2020. This leave of absence was unpaid because, at some point in September 2020, Haymond was no longer entitled to FMLA leave "due to insufficient hours within the past 12 months." *Id.* at 105.

On October 13, 2020, Haymond returned to work. For the remainder of October 2020, Haymond repeatedly arrived late or left early without providing notification. She left work early without notification on October 13 (26 minutes), October 14 (17 minutes), October 15 (8 minutes), October 16 (19 minutes), October 19 (35 minutes), October 20 (34 minutes), October 28 (9 minutes), and October 30 (3 ½ hours). She arrived late for work without notification on October 15 (15 minutes), October 22 (15 minutes), October 26 (24 minutes), October 28 (1 hour and 22 minutes), and October 29 (44 minutes).

On October 28, 2020, Regina Inmon ("Inmon"), Sexually Transmitted Disease Data Coordinator for the Office of Public Health at TDCJ, emailed Delao, relaying second-hand complaints about Haymond's performance and stated that Haymond's work had been lacking. Inmon did not work at the Plane State jail.

On October 29, 2020, UTMB Nurse Clinician III, Susan Roy ("Roy") asked Haymond whether she needed anything out of the front desk. Haymond felt that Roy was yelling at her and reported to the practice manager on duty that she was

3

leaving early that day because she could not deal with the systemic racism in her workplace.

On November 2, 2020, Delao signed Haymond's annual performance evaluation, which covered the period of September 1, 2019 through August 31, 2020. In that evaluation, Delao rated Haymond either "Meets" or "Exceeds"—as opposed to "Does Not Meet"—for every performance item.

On November 3, 2020, UTMB placed Haymond on administrative leave while Delao and McAlpin investigated Haymond's complaints of racial discrimination. Delao and McAlpin interviewed 14 individuals regarding Haymond's run-in with Martin and other complaints that Haymond had made. During the investigation, some of Haymond's White coworkers lodged their own complaints regarding what they perceived to be Haymond's lack of professionalism and her interference in treating inmates. At the same time, some of Haymond's Black coworkers submitted statements regarding what they perceived to be Martin's lack of professionalism. Delao and McAlpin's investigation found Haymond's complaints to be unsubstantiated based on the totality of the evidence. Martin resigned from his position in November 2020.

On November 11, 2020, while Delao and McAlpin were conducting their investigation, Inmon contacted Friesz to detail what she alleged were Haymond's failures to follow policy. Based on Inmon's complaints, Delao reviewed Haymond's Syphilis Monitoring Notes from the previous years.

On December 8, 2020, Delao contacted Haymond by phone to discuss the allegations against her, but Haymond refused to answer Delao's questions. On December 10, 2020, Delao emailed a letter to Haymond. Delao's letter notified Haymond that Delao intended to terminate Haymond's employment for compromising patient care, unprofessional behavior, and violations of UTMB's time and attendance policies.

On December 11, 2020, Haymond responded in writing, disputing many of the allegations against her and raising questions as to the accuracy of the

allegations. Delao terminated Haymond's employment via a letter dated December 21, 2020. In that letter, Delao "revised the information" from her December 10, 2020 letter regarding Haymond's attendance, as she was "on modified duty beginning October 13, 2020," but Delao otherwise failed to respond to any of the points or questions raised in Haymond's December 11, 2020 letter. Dkt. 32-1 at 29.

Haymond filed a Charge of Discrimination against UTMB with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a right-to-sue notice on September 7, 2021, and this action was timely instituted in Texas state court on December 7, 2021. UTMB removed this action to federal court on January 7, 2022. Haymond filed her First Amended Complaint on April 28, 2022, asserting race discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Haymond also asserts Texas state law claims of defamation and intentional infliction of emotional distress. Discovery is complete and UTMB has moved for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harville v. City of Houston*, 945 F.3d 870, 874 (5th Cir. 2019) (cleaned up). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But where the nonmovant "will bear the burden of proof at trial," *id.* at 322, the nonmovant must "present competent summary judgment evidence to support the essential elements of its claim." *Cephus v. Tex. Health & Hum. Servs. Comm'n*, 146 F. Supp. 3d 818, 826 (S.D. Tex. 2015).

The nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quotation omitted). Rather, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). At the summary judgment stage, I construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).

## ANALYSIS

### A. STATE LAW TORT CLAIMS

Haymond asserts claims for intentional infliction of emotional distress and defamation. *See* Dkt. 9 at 3–4. UTMB "asserts that sovereign immunity from both suit and liability bars [Haymond's state law tort] claims" and therefore, UTMB is entitled to summary judgment on those claims. Dkt. 22 at 8. I agree.

"Unless expressly waived, the Eleventh Amendment bars an action in federal court by . . . a citizen of a state against her own state, including a state agency." *Martinez v. Tex. Dep't of Crim. Just.*, 300 F.3d 567, 573 (5th Cir. 2002). UTMB is a state agency entitled to Eleventh Amendment sovereign immunity. *See Baldwin v. Univ. of Tex. Med. Branch at Galveston*, 945 F. Supp. 1022, 1030 n.4 (S.D. Tex. 1996) ("As part of the University of Texas System, UTMB is a state agency."), *aff'd*, 122 F.3d 1066 (5th Cir. 1997). "[T]he Texas Tort Claims Act does not waive sovereign immunity for intentional torts, such as defamation." *Id.* at 1030; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 ("This chapter does not apply to a claim . . . arising out of . . . any . . . intentional tort."). This should end the discussion.

Yet, Haymond argues that the "*United States* waived sovereign immunity under the Federal Tort Claims Act" ("FTCA"). Dkt. 33 at 7 (emphasis added). But Haymond is not suing the United States—Haymond is suing the State of Texas. To

the extent Haymond would argue that the FTCA applies "because UTMB caused [her] injuries while acting as an agent of the federal government," such an argument is a nonstarter. *O'Rourke v. United States*, 298 F. Supp. 2d 531, 535–36 (E.D. Tex. 2004). "The Fifth Circuit . . . has held that UTMB is an agency of the State of Texas and, as such, is immune to suit in federal court under the Eleventh Amendment." *Id.* at 536. Because "UTMB is a state agency, [Haymond] must establish that the State of Texas has waived its sovereign immunity to suit in federal district court for jurisdiction to be proper. As both a factual and legal matter, such a demonstration is impossible." *Id.* at 535. Accordingly, UTMB is entitled to summary judgment on Haymond's state law tort claims. UTMB, acting through its employees, may very well have defamed Haymond or intentionally caused her emotional distress. I do not express an opinion one way or the other. Rather, the law requires me to award summary judgment to UTMB because, as an arm of the Texas state government, it simply cannot be sued for these claims.

**B.     HOSTILE WORK ENVIRONMENT**

To establish a claim of hostile work environment under Title VII, Haymond must prove that

> (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). UTMB concedes that Haymond can establish the first two elements, but contends that Haymond "cannot show that she was subjected to unwelcomed race-based or color-based harassment that affected a term, condition, or privilege of her employment and that UTMB knew or should have known of the harassment and failed to take prompt remedial action." Dkt. 32 at 25. I agree.

The acts that Haymond claims created a hostile work environment consist of, at most, four instances of an unknown person removing her property from her

7

workplace, and Martin and Roy yelling at her on separate occasions. These isolated incidents are not enough to affect a term or condition of employment. Haymond did not face "discriminatory intimidation, ridicule, and insult." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009). None of the conduct alleged was "physically threatening or humiliating." *Id.* Accordingly, UTMB is entitled to summary judgment on Haymond's hostile work environment claim.

## C.  TITLE VII RACE DISCRIMINATION

### 1.  McDonnell Douglas *Burden-Shifting Framework*

Title VII makes it unlawful for an employer to discharge an employee because of her race. *See* 42 U.S.C. § 2000e-2(a)(1). The familiar *McDonnell Douglas* burden-shifting framework applies to Title VII discrimination claims. *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). Under the *McDonnell Douglas* framework, Haymond must first establish a *prima facie* case of discrimination. *See id.* at 425. To establish a prima facie case of discrimination, a plaintiff must show that she "(1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, . . . others similarly situated were treated more favorably." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (cleaned up). If Haymond carries her burden, then UTMB must provide a legitimate, nondiscriminatory reason for Haymond's termination. *See Byers*, 209 F.3d at 425. If UTMB offers such a reason, the burden shifts back to Haymond, who "must then prove, by a preponderance of the evidence, that the proffered reason was mere pretext for discrimination." *Id.*

"If the employer produces any evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action, then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quotation omitted). At that point, "[Haymond] must present substantial evidence that [UTMB's] legitimate,

8

nondiscriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) (quotation omitted). This means "[Haymond] must substantiate h[er] claim of pretext through evidence demonstrating that discrimination lay at the heart of [UTMB's] decision." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).

"Pretext is established either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Delaval*, 824 F.3d at 480 (quotation omitted). "If the employer offers more than one reason, the plaintiff must put forward evidence rebutting *each* of the nondiscriminatory reasons the employer articulates." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation omitted). "The quality and weight of the evidence determines whether it is substantial." *Id.* at 369.

### 2. *Haymond Cannot Establish that All of UTMB's Legitimate, Non-retaliatory Reasons for Her Termination Are Pretext*

"To establish a prima facie case, a plaintiff need only make a very minimal showing. Therefore, [I] assume [for the sake of argument] that [Haymond] has established a *prima facie* case." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (cleaned up). Applying the *McDonnell Douglas* test, the burden then shifts to UTMB to articulate a legitimate, non-retaliatory reason for terminating Haymond.

UTMB offers three reasons for terminating Haymond: (1) she compromised patient care; (2) she engaged in unprofessional conduct; and (3) she violated time and attendance policies. These are all legitimate, non-retaliatory reasons for adverse employment actions. *See Delaval*, 824 F.3d at 480 (an employee's violation of the employer's attendance policy constitutes a legitimate, non-retaliatory reason for terminating the employee); *Corley v. Louisiana ex rel. Div. of Admin., Off. of Risk Mgmt.*, 498 F. App'x 448, 451 (5th Cir. 2012) (plaintiff's "insubordinate behavior and inappropriate communications" served as legitimate, non-retaliatory reasons for termination); *Zeigler v. Univ. of Miss. Med. Ctr.*, 877

9

F. Supp. 2d 454, 462 (S.D. Miss. 2012) (plaintiffs' activities that "compromised patient care" constituted a legitimate, non-retaliatory reason for termination).

UTMB disputes whether Haymond can establish that any of the three reasons for her termination are pretextual. I disagree as to the first two reasons. As explained below, there is ample evidence in the record from which a jury could find that compromising patient care and unprofessional behavior are reasons that are either false or unworthy of credence.[1] Unfortunately for Haymond, UTMB also claims to have terminated her employment, at least in part, due to time and attendance issues. Because Haymond cannot establish that time and attendance is a pretextual reason for terminating her employment, her discrimination claim must fail. But first, I will show why compromising patient care and unprofessional behavior are pretexts for discrimination.

### a. Compromising Patient Care

Whether Haymond actually committed a medical error is a genuinely disputed material fact. Haymond testified that, to her knowledge, she never missed an injection. *See* Dkt. 42 at 104. This testimony should not come as a surprise to UTMB, because this was Haymond's December 11, 2020 response to Delao's December 10, 2020 letter providing notice of Delao's intent to terminate Haymond's employment:

> When you called me on 12/8/20 to question me about missed second doses, I asked you what the time frames was because I have been out, I'll [sic] with either myself for my children a lot. I could not give you an exact answer because you told me you could not give me any information. The allegations in the letter are extreme and unfounded. For them to be included without proper research is unfair to me. Just because you want to get rid of me, that is fine, that is your right, but to lie about me and attempt to slander my name and license

---

[1] Haymond cannot establish disparate impact because—although she has identified other individuals who are alleged to have committed *some* of her same violations—she has not identified a single individual who is alleged to have committed all of the same violations: compromising patient care *and* unprofessional behavior *and* violation of time and attendance policies. *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (comparators must "have essentially comparable violation histories").

> is unlawful. I asked you where you were going with these questions because they [sic] were strong allegations connected to them, and you would not explain to me what they were regarding. . . .
>
> . . . Again, like I asked you yesterday when you had Ms. Buys on the phone if the missed dose happened while I was out on leave. So, then the responsibility falls on the nurses present because [bicillin] injections are on the nursing reminders that are pulled daily.

Dkt. 32-1 at 26. Someone who reviewed Haymond's response wrote in all capital letters, presumably to Delao: "DO YOU HAVE SUPPORT DOCUMENTATION THAT CLEARLY INDICATES SHE WAS RESPONSIBLE NOT OTHERS?" *Id.*

One would think, after receiving this written rebuttal from Haymond, that Delao would have revised the termination letter to definitively establish Haymond's alleged medical errors. This is especially so given that—according to a November 11, 2020 email from Friesz to Senior Human Resources Manager Charlotte Kearney ("Kearney"), McAlpin, and Delao—"delayed patient care . . . [was] *the* reason termination [was] being pursued." Dkt. 33-1 at 44 (emphasis added). Yet, despite Haymond's request for time frames and information, this is the only detail that Delao provided in the December 21, 2020 termination letter to support the allegations of medical error against Haymond:

> Inmon related that on multiple occasions she had provided the order for the series of three bicillin injections needed for treatment of syphilitic patients, but you only administered two of the necessary injections. This resulted in treatment delays and required the patients to start the series over from the first injection. She provided Mr. Friesz with multiple patient records demonstrating your negligence in this activity.

Dkt. 32-1 at 31. Although she referenced "multiple occasions" and "multiple patient records," Delao offered no specifics regarding time frame or whether Haymond was working, and thus responsible for giving such injections on the days the missed injections were due. Delao did not provide a specific date for any single patient record. Such a serious allegation, with professional licensing consequences that extend beyond termination, should be documented, and explained.

11

Even now it is not obvious to me that Haymond was responsible for any missed injections. Indeed, Haymond testified that, to her knowledge, she has never missed an injection. *See* Dkt. 42 at 104. Delao's declaration in support of UTMB's Motion for Summary Judgment states simply: "I also reviewed all of Ms. Haymond's treatment of patients in 2019 to 2020 and found several violations of protocol and policy." Dkt. 32-1 at 7. Yet, Delao never elaborates on what those violations were, what dates the violations occurred, or why they are grounds for termination. "Conclusory declarations are insufficient to create issues of fact." *Owens. v. Circassia Pharms., Inc.*, 33 F.4th 814, 827 (5th Cir. 2022).

I recognize that Delao attached medical records to her declaration, but without some explanation, these documents are meaningless. *See* Dkt. 32-1 at 122–41. I cannot tell where one patient's records end and another's begin. I do not know whose handwriting is scribbled on the records. Perhaps most importantly, the records do not answer the question: was Haymond the only nurse working and therefore the only nurse responsible for giving injections on the day that injections were missed? Haymond asked that question before she was terminated and it has never been answered. This fact alone is enough to question the legitimacy of this reason for terminating Haymond's employment.

Finally, according to the redacted medical records that UTMB submitted, Inmon was aware of at least one alleged medical error as far back as March 24, 2020, when Inmon closed out the patient's chart a mere four days after Haymond. Yet, Inmon waited ***more than seven months***, until November 11, 2020, when Haymond was already on administrative leave, to protest Haymond's allegedly grievous errors. *See id.* at 31. In a draft notice-of-intent-to-terminate letter, at least one person in UTMB's administration recognized how problematic this timing was:

- In a phone conversation with Greg Friesz, Region 3 Nurse Manager, on November 11, 2020, Ms. Inmon related that on multiple occasions she had provided the order for the series of three bicillin injections needed for treatment of syphilitic patients, but you only administered two of the necessary injections. This resulted in treatment delays and required the patients to start the series over from the first injection. She provided Mr. Friesz with multiple patient records demonstrating your negligence in this activity. HOW MANY AND WHAT TIMEFRAME? HAD INMON REPORTED THIS PREVIOUSLY? IF NOT, WHY NOT IF IT EFFECTED PATIENT CARE?

Dkt. 33-1 at 40.² In short, a reasonable jury could find UTMB's claim to have fired Haymond for compromising patient care to be false or unworthy of credence.

### b. Unprofessional Behavior

In her interrogatory responses, Haymond identifies Melissa Antonini ("Antonini"), a White vocational nurse, as a similarly situated employee who was treated more favorably. Specifically, Haymond responded:

> Antonini was allowed to exhibit extreme behavior and use racially negative expressions for years. Complaints were met with that's just "Antonini," that's how she is. It wasn't until a Caucasian nurse practitioner Guillory complained, when she heard Antonini call an inmate a "nigger," then eventually she was no longer a UTMB employee.

Dkt. 32-1 at 13. UTMB contends "Antonini violated UTMB policy, she was investigated, and she was issued an Intent to Terminate for said violation," so Antonini was not treated more favorably than Haymond. Dkt. 32 at 21–22. But UTMB misconstrues Haymond's argument, which is that Antonini's "extreme behavior" and "racially negative expressions" were tolerated "*for years*," and that complaints about Antonini's behavior were taken seriously *only* once a White nurse complained about a racial slur. Dkt. 32-1 at 13 (emphasis added).

UTMB never responds to Haymond's assertion that Antonini's unprofessional behavior was tolerated for years until a White nurse complained after hearing Antonini utter a racial slur. When a party "fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2). Thus, I take it as undisputed that Antonini—a White nurse—was "rude, disrespectful, [and] made negative comments to [other] team member[s]," Dkt. 33-1 at 22, for years with impunity,

---

² The record does not reflect who typed this question, but it is clear from the use of all caps and other questions in the document that it was someone within UTMB's administration. *See id.* at 39 ("HAS HAYMOND BEEN ASKED ABOUT THE NOVEMBER REPORTS ABOVE? I THOUGH [sic] THERE WAS MUCH MORE???").

and that complaints against Antonini were investigated only when a White nurse complained after hearing Antonini utter a racial slur.

This is but one of many instances of UTMB's White administrators crediting the statements of White workers over Black workers. Recall that Antonini, a White nurse, was terminated *only* once she was reported by another White nurse for uttering a racial slur. On the other hand, when Haymond, a Black nurse, lodged complaints about her White coworkers' aggressive behavior and racism, the investigation into those complaints was turned back onto Haymond. For example, in the December 21, 2020 termination letter, Delao credited complaints from Martin about Haymond—regarding the day that Haymond complained Martin was harassing *her*—as examples of *Haymond's* allegedly unprofessional behavior. *See* Dkt. 32-1 at 29–30. This happened even though a Black nurse, Gwendolyn Durham ("Durham"), told Delao that Martin once "got so angry that he threw his clipboard across the room," which scared another nurse. Dkt. 33-1 at 18. Durham also told Delao that Martin "has been disrespectful" and "that one night when she and Martin [were] alone, he told her he's one white guy with a bunch of black women," which "made her uncomfortable, especially since there was no one else around." *Id.* at 18–19.

All in all, I believe that a reasonable jury could find that UTMB included disputed allegations regarding Haymond's behavior in the termination letter as pretext for discrimination.

### c. Time and Attendance Policies

It is well-settled that Haymond must rebut "*each* of the nondiscriminatory reasons the employer articulates" for her discrimination claim to survive summary judgment. *Jones*, 8 F.4th at 368 (quotation omitted). As noted, UTMB has provided three reasons for terminating Haymond's employment: compromising patient care, unprofessional behavior, and violation of UTMB's time and attendance policies. Although I have concluded that a jury could find that two of

14

those reasons for terminating Haymond are pretextual, Haymond cannot establish that her violation of UTMB's time and attendance policies was pretextual.

Haymond does not dispute that she "came in late and/or left early without notice as well as worked through meal break without approval." Dkt. 32-1 at 30. Haymond does not dispute that this was a violation of UTMB's time and attendance policies, or a legitimate reason for terminating her employment. Haymond has not offered evidence that other employees also arrived late or left early without notice, or worked through their meal breaks without approval, but were treated differently than her. *See* Dkt. 42 at 90 ("I didn't track everybody's time card.").[3] Accordingly, Haymond cannot show that UTMB's terminating her employment for violating its time and attendance was pretext. For this reason, Haymond's discrimination claim fails.

### D.  TITLE VII RETALIATION

To establish a prima facie case of retaliation, Haymond must show that (1) she "engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Abbt v. City of Houston*, 28 F.4th 601, 610 (5th Cir. 2022) (quotation omitted). "Both discrimination and retaliation claims under Title VII are subject to the *McDonnell Douglas* burden-shifting framework." *Jones*, 8 F.4th at 368. Thus, even assuming that Haymond can establish a prima facie case of retaliation, she must rebut "*each* of the nondiscriminatory reasons the employer articulates" for her discrimination claim to survive summary judgment. *Jones*, 8 F.4th at 368 (quotation omitted). Because Haymond cannot rebut that her violation of UTMB's time and attendance policies was a legitimate,

---

[3] In quoting this part of Haymond's deposition testimony, I am not suggesting that Haymond should have tracked her coworker's timecards. But discovery was the time to request this type of information, and summary judgment is the time to point to such evidence. Haymond has not pointed me to any evidence suggesting that similarly situated individuals were treated differently with regard to time and attendance violations.

nondiscriminatory reason for terminating her employment, her retaliation claim must also fail.

## CONCLUSION

For the reasons discussed above, I recommend that UTMB's Motion for Summary Judgment (Dkt. 32) be **GRANTED**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 25th day of June 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE